**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| GEORGE ASSAD, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FORESTAR GROUP INC., JAMES A. RUBRIGHT, M. ASHTON HUDSON, DANIEL B. SILVERS, RICHARD M. SMITH, RICHARD D. SQUIRES, PHILLIP J. WEBER, STARWOOD CAPITAL GROUP, TERRA FIRMA MERGER PARENT, L.P., and TERRA FIRMA MERGER SUB, L.P., <br><br> Defendants. | Case No. 1:17-cv-00529 <br><br> JURY TRIAL DEMANDED <br><br> CLASS ACTION |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.  This action stems from a proposed transaction announced on April 13, 2017 (the "Proposed Transaction"), pursuant to which Forestar Group Inc. ("Forestar" or the "Company") will be acquired by affiliates of Starwood Capital Group.

2.  On April 13, 2017, Forestar's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Terra Firma Merger Parent, L.P. ("Parent") and Terra Firma Merger Sub, L.P. ("Merger Sub," and together with Parent and Starwood Capital Group, "Starwood"). Pursuant to

the terms of the Merger Agreement, shareholders of Forestar will receive $14.25 per share in cash.

3. On May 19, 2017, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Forestar common stock.

9. Defendant Forestar is a Delaware corporation and maintains its principal

executive office at 6300 Bee Cave Road, Building Two, Suite 500, Austin, Texas 78746. Forestar's common stock is traded on the NYSE under the ticker symbol "FOR."

10. Defendant James A. Rubright ("Rubright") is a director of Forestar and has served as Chairman of the Board since September 2015. According to the Company's website, Rubright is the Chairman of the Audit Committee and a member of Management Development and Executive Compensation Committee.

11. Defendant M. Ashton Hudson ("Hudson") is a director of Forestar. According to the Company's website, Hudson is a member of the Audit Committee and the Nominating and Governance Committee.

12. Defendant Daniel B. Silvers ("Silvers") is a director of Forestar. According to the Company's website, Silvers is the Chairman of the Management Development and Executive Compensation Committee and a member of the Nominating and Governance Committee.

13. Defendant Richard M. Smith ("Smith") is a director of Forestar. According to the Company's website, Smith is the Chairman of the Nominating and Governance Committee and a member of the Management Development and Executive Compensation Committee.

14. Defendant Richard D. Squires ("Squires") is a director of Forestar. According to the Company's website, Squires is a member of the Audit Committee and the Nominating and Governance Committee.

15. Defendant Phillip J. Weber ("Weber") is a director of Forestar and has served as Chief Executive Officer ("CEO") since September 2015.

16. The defendants identified in paragraphs 10 through 15 are collectively referred to herein as the "Individual Defendants."

17. Defendant Starwood Capital Group is a private alternative investment firm.

18. Defendant Parent is a Delaware limited partnership and a party to the Merger Agreement.

19. Defendant Merger Sub is a Delaware limited partnership, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Forestar (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21. This action is properly maintainable as a class action. The Class is so numerous that joinder of all members is impracticable. As of April 12, 2017, there were approximately 41,857,512 shares of Forestar common stock outstanding held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

22. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

23. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible

standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

26. Forestar is a residential and mixed-use real estate development company.

27. At year-end 2016, the Company owned directly or through ventures interests in 50 residential and mixed-use projects comprised of approximately 4,600 acres of real estate located in 10 states and 14 markets.

28. Additionally, Forestar owns interests in various other assets that have been identified as non-core that the Company is divesting opportunistically over time. At year-end 2016, the Company's remaining non-core assets principally included over 523,000 net acres of owned mineral assets principally located in Texas, Louisiana, Georgia, and Alabama, 19,000 acres of timberland and undeveloped land (including mitigation banking), four multifamily assets, and approximately 20,000 acres of groundwater leases in central Texas.

29. Forestar operates in three business segments: real estate, mineral resources, and other.

30. On March 1, 2017, Forestar issued a press release wherein it reported its fourth quarter and full year 2016 financial results. The Company reported full year 2016 net income of

approximately $58.6 million, or $1.38 per share outstanding, compared to full year 2015 net loss of approximately $(213.0) million, or $(6.22) per share outstanding.  Full year 2016 earnings from continuing operations were approximately $75.5 million, or $1.78 per share outstanding, compared to full year 2015 net loss from continuing operations of approximately $(26.9) million, or $(0.79) per share outstanding.  With respect to the financial results, Individual Defendant Weber commented:

> 2016 was a transformative year for Forestar. We made exceptional progress executing our key initiatives to divest non-core assets, reduce outstanding debt, reduce SG&A costs and focus on maximizing shareholder value from our core community development business. Key highlights included selling nearly $482 million in non-core assets, reducing outstanding debt by over $320 million since third quarter 2015, and reducing annual interest expense by approximately $23 million going forward. Forestar is actively selling or preparing to sell its nine remaining non-core assets in 2017, four of which are already under contract to be sold. Sales of these remaining non-core assets will generate additional cash and annual SG&A savings[.]
>
> In addition to executing these key initiatives, we have focused on maximizing shareholder value delivered from our core community development business. Builder demand for residential lots in our key communities remains steady. We sold 1,940 residential lots in 2016 and we began 2017 with approximately 2,100 residential lots under option contract with builders[.]

31.     Nevertheless, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

32.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 6.5(a) of the Merger Agreement states:

6

(a) The Company shall, and shall cause its Subsidiaries and its and their respective Representatives to, immediately cease and cause to be terminated any and all existing activities, discussions or negotiations with any Third Person and its Representatives concerning any Acquisition Proposal or discussion that could lead to an Acquisition Proposal, cease providing any further information with respect to the Company, its Subsidiaries or any Acquisition Proposal to any such Third Person or its Representatives, terminate access for any such Third Persons and their Representatives to any physical or electronic data room, and request that any such Third Person and its Representatives in possession of confidential information about the Company or its Subsidiaries that was furnished by or on behalf of the Company to such Persons in connection with such activities, discussions or negotiations return or destroy all such information in accordance with any confidentiality agreement or similar agreement between the Company and such Third Person. From and after the date of this Agreement, except as expressly permitted by this Section 6.5, the Company and its Subsidiaries shall not (and the Company shall direct its and their respective Representatives not to), directly or indirectly, (i) solicit, request, initiate or knowingly facilitate or encourage (including by way of furnishing or disclosing information) any proposal, offer or inquiry that constitutes, or is reasonably likely to lead to, an Acquisition Proposal, or take any other action to facilitate or initiate the making of any Acquisition Proposal, (ii) enter into, continue or otherwise participate in discussions or negotiations with, furnish or make available any information, or afford access to the business, properties, assets, books or records of the Company or any of its Subsidiaries to, any Third Person in connection with any Acquisition Proposal or any proposal, offer or inquiry that could reasonably be expected to lead to, an Acquisition Proposal, (iii) amend or grant any waiver or release under or fail to enforce any standstill or similar agreement with respect to any class of equity securities of the Company or any of its Subsidiaries, unless the Company Board after considering advice from outside legal counsel to the Company that the failure to waive or release or fail to enforce such provision would reasonably be expected to be inconsistent with its fiduciary duties under applicable Laws of the State of Delaware, (iv) approve any Third Person becoming an "interested stockholder" under Section 203 of the DGCL, (v) enter into any agreement in principle, memorandum of understanding, letter of intent, term sheet, merger agreement, acquisition agreement, option agreement or other similar Contract relating to an Acquisition Proposal (other than the confidentiality agreements permitted under Section 6.5(b)(iii)) (each, an "Acquisition Agreement") or (vi) propose publicly to do any of the foregoing. Nothing in this Section 6.5 shall prohibit the Company, its Subsidiaries and its and their respective Representatives from informing any Person of the existence of the provisions contained in this Section 6.5 or clarifying the terms and conditions thereof. It is understood that any violation of the restrictions on the Company set forth in this Section 6.5 by any Subsidiary of the Company or any of their respective Representatives shall be deemed a breach of this Section 6.5 by the Company.

33.     Further, the Company must promptly advise Starwood of any proposals or inquiries received from other parties. Section 6.5(c) of the Merger Agreement states:

> (c) The Company shall notify Parent in writing promptly (but in no event later than 24 hours) after receipt by the Company, its Subsidiaries or any of their respective Representatives of any Acquisition Proposal, any bona fide written indication that a Third Person intends to make an Acquisition Proposal or any written request for information relating to the Company and its Subsidiaries or for access to the business, books or records of the Company or any of its Subsidiaries, in each case by any Third Person that intends to make an Acquisition Proposal in connection therewith. The Company shall identify the Third Person making, and the material terms and conditions of, any such Acquisition Proposal, indication or request (including any material changes thereto). The Company shall keep Parent reasonably informed on a current basis of any material developments, discussions or negotiations regarding any such Acquisition Proposal, indication or request (including any changes thereto), and shall promptly (but in no event later than 24 hours after receipt) provide to Parent copies of all correspondence and written materials sent or provided to the Company or any of its Subsidiaries that describes any terms or conditions of any Acquisition Proposal (as well as written summaries of any material oral communications addressing such matters).

34.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Starwood a "matching right" with respect to any "Superior Proposal" made to the Company. Section 6.5(e) of the Merger Agreement provides:

> (e) If, prior to obtaining the Company Stockholder Approval, the Company receives an Acquisition Proposal that the Company Board concludes in good faith, after consultation with a financial advisor of nationally recognized reputation and outside legal counsel, constitutes a Superior Proposal, the Company Board may effect a Change in Company Recommendation or terminate this Agreement pursuant to Section 8.1(c)(ii) to enter into a definitive, written agreement concerning such Superior Proposal, if, and only if:
>
> (i) the Company shall have provided prior written notice to Parent, at least four Business Days in advance (the "Notice Period"), of its intention to effect a Change in Company Recommendation pursuant to this Section 6.5(e) or to terminate this Agreement to enter into a definitive, written agreement concerning a Superior Proposal pursuant to Section 8.1(c)(ii), which notice shall specify the basis for such Change in Company Recommendation or termination and the identity of the party making such Superior Proposal, the material terms and conditions thereof and all material documents relating to such Acquisition

8

Proposal; provided that in the event of any material revisions to the Acquisition Proposal that the Company Board has determined to be a Superior Proposal, the Company shall be required to deliver a new written notice to Parent and to comply with the requirements of this Section 6.5(e) with respect to such new written notice (it being understood that the "Notice Period" in respect of such new written notice shall be two Business Days);

(ii) the Company Board shall have determined in good faith, after consultation with outside legal counsel, that failure to effect a Change in Company Recommendation or terminate this Agreement to enter into a Superior Proposal, as applicable, would be inconsistent with its fiduciary duties to the stockholders of the Company under applicable Law and the Company shall have complied in all material respects with all of its obligations under this Section 6.5;

(iii) after providing the notice contemplated by Section 6.5(e)(i), the Company shall have discussed and negotiated, and shall have caused its Representatives to discuss and negotiate, with Parent and its Representatives in good faith (to the extent Parent has requested that the Company discuss and negotiate with Parent and its Representatives) during the Notice Period such adjustments in the terms and conditions of this Agreement as would permit the Company Board not to effect a Change in Company Recommendation or terminate this Agreement to enter into a Superior Proposal, as applicable; and

(iv) (A) the Company Board shall have considered in good faith any proposed changes to this Agreement offered in writing by Parent no later than 5:00 p.m. (Eastern Time) on the last day of the Notice Period, and, taking into account any such proposed changes, shall have determined in good faith, after consultation with a financial advisor of nationally recognized reputation and outside legal counsel, that the Superior Proposal would continue to constitute a Superior Proposal if such changes were to be given effect and the failure to take such action would continue to be inconsistent with the Company Board's fiduciary duties to the stockholders of the Company under applicable Law and (B) in the case of any termination of this Agreement in order to cause or permit the Company or any of its Subsidiaries to enter into an Acquisition Agreement concerning a Superior Proposal, the Company shall have validly terminated this Agreement in accordance with Section 8.1(c), including paying the Company Termination Fee in accordance with Section 8.2(h).

35. Further locking up control of the Company in favor of Starwood, the Merger Agreement provides for a "termination fee" of $20 million, payable by the Company to Starwood if the Individual Defendants cause the Company to terminate the Merger Agreement.

36. By agreeing to all of the deal protection devices, the Individual Defendants have

9

locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

37.     The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

38.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

39.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

40.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

41.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

42.     First, the Proxy Statement omits material information regarding the Company's financial projections and the analyses performed by the Company's financial advisor, JMP Securities LLC ("JPM"), in support of its so-called fairness opinion.

43.     With respect to Forestar's financial projections, the Proxy Statement fails to disclose, *inter alia*: (i) debt repayment; (ii) interest expense; (iii) interest income; (iv) tax benefit of interest tax deductible; (v) consolidated venture cash flows due to third parties; and (vi) a reconciliation of all non-GAAP to GAAP metrics.

44.     With respect to JPM's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the line items used to calculate Forestar's unlevered free cash flows; (iii) the

10

implied terminal values for Forestar; (iii) the inputs and assumptions underlying the discount rates ranging from 13.1% to 16.1%; and (iv) JPM's basis for applying a range of perpetuity growth rates of 2.5% to 0.5%.

45.     With respect to JPM's *Net Asset Valuation Analysis*, the Proxy Statement fails to disclose: (i) the "other real estate asset values" provided by Forestar to JPM; and (ii) the book values as of December 31, 2016 for Forestar's other assets and liabilities as provided by Forestar to JPM.

46.     With respect to JPM's *Premiums Paid in Selected Historical M&A Transactions*, the Proxy Statement fails to disclose: (i) the selected acquisitions observed by JPM in the analysis; and (ii) the implied premiums paid in such transactions.

47.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

48.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the Forestar Board of Directors and Reasons for the Merger"; (iii) "Opinion of Forestar's Financial Advisor"; and (iv) "Projected Financial Information."

49. Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

50. Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Forestar's officers and directors, including who participated in all such communications.

51. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

52. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the Forestar Board of Directors and Reasons for the Merger"; and (iii) "Interests of the Company's Directors and Executive Officers in the Merger."

53. Third, the Proxy Statement omits material information regarding potential conflicts of interest of JPM.

54. Specifically, the Proxy Statement fails to disclose whether JPM has provided services to Forestar, Starwood, or their affiliates in the past two years, as well as the amount of compensation received by JPM for such services.

55. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

56. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the Forestar Board of Directors and Reasons for the Merger"; and (iii) "Opinion of Forestar's Financial Advisor."

57. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Forestar's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Forestar

58. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

59. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Forestar is liable as the issuer of these statements.

60. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

61. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

62. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate

disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

63.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

64.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

65.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Starwood

66.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

67.     The Individual Defendants and Starwood acted as controlling persons of Forestar within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Forestar and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

68.     Each of the Individual Defendants and Starwood was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

69.     In particular, each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

70.  Starwood also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

71.  By virtue of the foregoing, the Individual Defendants and Starwood violated Section 20(a) of the 1934 Act.

72.  As set forth above, the Individual Defendants and Starwood had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.  Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.  In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.  Directing the Individual Defendants to disseminate a Proxy Statement that does

not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: June 2, 2017

**KENDALL LAW GROUP, PLLC**

By:  */s/ Joe Kendall*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Telephone:  (302) 295-5310
Facsimile:  (302) 654-7530

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
Telephone:  (484) 324-6800
Facsimile:  (484) 631-1305

Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
Jamie J. McKey
Texas Bar No. 24045262
jmckey@kendalllawgroup.com
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone:  (214) 744-3000
Facsimile:  (214) 744-3015

*Attorneys for Plaintiff*